AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.   2:20-mj-0108 AC |
| GREGORY TABAREZ,  and | ) | |
| JOSEPH ELIJAH CUARON | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

**FILED**

**Jul 16, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____February 01, 2020 to present_____ in the county of _____Yolo_____ in the
_____Eastern_____ District of _____California_____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1) | Conspiracy to distribute  and to possess with intent to distribute  Fentanyl |

This criminal complaint is based on these facts:

See Affidavit of Federal Bureau of Investigation Special Agent David Sieber, attached hereto and incorporated by reference.

☒  Continued on the attached sheet.

_____
/s/ David Sieber

*Complainant's signature*

David Sieber, Special Agent FBI

*Printed name and title*

Sworn to before me and signed telephonically.

Date:  _____July 16, 2020_____

_____
*Judge's signature*

City and state:  _____Sacramento, CA_____

Allison Claire, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT OF FBI SPECIAL AGENT DAVID SIEBER

I, Federal Bureau of Investigation Special Agent David Sieber, being duly sworn, hereby depose and state:

## CRIMINAL COMPLAINT FOR ARREST WARRANTS AND SEARCH WARRANTS

1. This Affidavit is submitted in support of an arrest warrant and a criminal complaint charging **Gregory Tabarez** (hereinafter **Tabarez**) with:

   COUNT ONE: Conspiracy to distribute and to possess with intent to distribute Fentanyl, in violation of 21 U.S.C. §§ 846, 841(a)(1).

2. **Tabarez'** criminal history includes:
   - March 2017 - Felony conviction for possession of methamphetamine for sale, in violation of California Health and Safety Code Section 11378.
   - February 2018 - Felony conviction for carrying a loaded firearm in a public place, in violation of California Penal Code Section 25850(A).
   - February 2020 - Felony conviction for felon in possession of a firearm under the California street gang act, in violation of California Penal Code Section 29800(A)(1).
   - **Tabarez** is currently on active California Parole.

3. This Affidavit is also submitted in support of an arrest warrant and a criminal complaint charging **Joseph Elijah Cuaron** (hereinafter **Cuaron**) with:

   COUNT ONE: Conspiracy to distribute and to possess with intent to distribute Fentanyl, in violation of 21 U.S.C. §§ 846, 841(a)(1).

4. **Cuaron's** criminal history includes:
   - December 2017 - Juvenile felony conviction for possession of a concealed weapon, in violation of California Penal Code Section 25400(A)(2).
   - May 2019 - Felony conviction for possession of a firearm by a prohibited person, in violation of California Penal Code Section 29815(A).
   - June 2020 - **Cuaron** was arrested and charged in Reno, Nevada, for one felony count of robbery, in violation of Nevada Statute NRS 200.380, one felony count of conspiracy to commit robbery, in violation of Nevada Statute NRS 200.380, one felony count of battery to commit mayhem/robbery/grand larceny, in violation of Nevada State NRS 200.400.2 and one felony count of battery, in

violation of Nevada Statute NRS 200.481.1. The state of Nevada has not issued a disposition on these charges.

- **Cuaron** is currently on active California parole and GPS ankle monitoring.

5. This Affidavit is also submitted in support of a search warrant for the following items:

### MOBILE PHONES TO BE SEARCHED
- **A-1**: (Seized on **Cuaron's** person incident to arrest) Black iPhone XR Model MT2E2LL/A, Serial Number FK2XPM91KXKN (Described further in Attachment A-1)
- **A-2**: (Seized on **Cuaron's** person incident to arrest) LG Model LM-K500UM, IMEI: 352488116634826, Serial Number 006VTRG0338582 (Described further in Attachment A-2)
- **A-3**: (Seized on **Cuaron's** person incident to arrest) Coolpad Model Coolpad 3312A, FCC ID R38YL3312A, Build Number 3312A.SPRINT.191018.OD (Described further in Attachment A-3)
- **A-4**: (Seized in rental vehicle incident to arrests of **Tabarez** and **Joshua Cabanillas**, hereinafter **Cabanillas**) Black iPhone Model A1160, FCC ID BCG-E3085A, in dark tinted Tech21 Case (Described further in Attachment A-4)
- **A-5**: (Seized in rental vehicle incident to arrests of **Tabarez** and **Cabanillas**) Red iPhone, in clear Tech21 Case (Described further in Attachment A-5)
- **A-6**: (Seized in rental vehicle incident to arrests of **Tabarez** and **Cabanillas**) ZTE Smart Phone Model Z982, IMEI: 869977032137886, Serial Number 320284580429 (Described further in Attachment A-6)
- **A-7**: (Seized in rental vehicle incident to arrests of **Tabarez** and **Cabanillas**) Samsung Smart Phone Model SM-A205U, IMEI: 35274117885452 (Described further in Attachment A-7)

## BACKGROUND AND EXPERTISE

6. I am a special agent with the FBI. I entered on duty at the FBI Academy in Quantico, Virginia on October 6, 2002. I am currently assigned to the FBI's Sacramento Division, Violent Crime Safe Streets Task Force. I have been assigned to this squad since 2011.

7. During the course of my employment as an FBI special agent, I have participated in numerous criminal and national security investigations. I have also participated in numerous investigations involving the use of federal and state search warrants to collect evidence, including controlled substances, the seizure of narcotics-related records, and other types of evidence that document the activities of criminal organizations in both the

manufacturing and distribution of controlled substances and weapons. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including physical and electronic surveillance, various types of infiltration (including undercover agents, informants, and confidential human sources), pen register and trap and trace devices, GPS and telephone tracking devices, trash covers, mail covers, pole cameras, stationary video recording vehicles, audio and audio/video recording devices.

8.  I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

9.  Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested complaint, search and arrest warrant, I have not included each and every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to support probable cause.

10. This affidavit is based upon my own personal knowledge and upon the knowledge of other law enforcement officers involved in this investigation.  Where I describe statements made by other people (including other special agents and law enforcement officers), the statements are described in sum, substance, and relevant part. Similarly, where I describe information contained in reports and other documents or records in this affidavit, this information is described in sum, substance, and relevant part.

## STATEMENT OF PROBABLE CAUSE

11. The FBI's Sacramento Division Safe Streets Task Force (SSTF) has been investigating the drug trafficking activities of **Joshua Adrian Cabanillas**, hereinafter **Cabanillas**, since November 2018. In early 2020, the County of Yolo recognized a significant increase in Fentanyl-related overdoses and deaths. FBI investigation indicates that over the past six months, there have been approximately 15 overdoses and five overdose-related deaths in Yolo County alone. In February 2020, 18-year-old Mason Tafoya died of an overdose in Yolo County. The Yolo Coroner's report indicated that Tafoya had nearly three times the lethal amount of Fentanyl in his system at the time of his death.

12. Subsequent SSTF investigation including audio/video recordings and controlled pill buy/walk operations identified **Cabanillas** as the principal suspect connected to the death of Tafoya. On May 8, 2020, the SSTF conducted the controlled purchase of 53 "M30" pills from **Cabanillas** and **Severo "Silva" Reyna**; hereinafter **Reyna**, with an FBI

Confidential Human Source, hereinafter CHS-1[1]. On May 18, the SSTF conducted the controlled purchase of 100 "M30" pills from **Cabanillas** and **Reyna** with CHS-1. Subsequent DEA laboratory analysis indicated that these spills contained Fentanyl and Acetaminophen.

13. On July 9, 2020, **Cabanillas** and **Reyna** were indicted in the Eastern District of California for violations of the U.S. controlled Substances Act. Specifically, they were charged with conspiracy to distribute and to possess with intent to distribute Fentanyl, in violation of 21 U.S.C. §§ 846, 841(a)(1).

14. On July 13, 2020, in an effort to arrest **Cabanillas** and **Reyna**, CHS-1 was instructed to order 500 "M30" pills from **Cabanillas**. Prior to the buy/walk operation, on July 10, 2020, and again on July 12, 2020, CHS-1 exchanged a series of text messages with **Cabanillas**, on telephone number 916-622-9446, to arrange the purchase of 500 "blues" (pills).[2] On July 13, 2020, **Cabanillas** text messaged CHS-1 to let him/her know he was ready to sell CHS-1 the 500 pills.

15. Based on my training, experience and familiarity with this investigation, I know that narcotics traffickers describe blue pills imprinted with "M30" as "blues." I know that blue pills imprinted with "M30," when supplied by a pharmacy or pharmaceutical manufacturer, contain Oxycodone Hydrochloride in the amount of 30 mg. I also know that counterfeit M30 pills, containing fentanyl, are increasingly appearing on the black market in Yolo County, and throughout California. Further, I know that illicit manufacturers of counterfeit pills often imprint their product with markings that correlate to authentic pills in order to command higher prices for their product. Both Oxycodone Hydrochloride and Fentanyl are Schedule II controlled substances.

16. On July 13, 2020, at approximately 2:36 p.m., CHS-1 was picked up by Handling Agents. CHS-1's person was searched for weapons and/or contraband with negative results and he/she was briefed regarding the objectives of the operation and safety considerations. At

---

[1] CHS-1 has worked as a Confidential Human Source for the FBI since July 2018. CHS-1 has provided information and conducted controlled narcotics purchases for this investigation and other investigations in return for remuneration. To date, CHS-1 has been paid $23,970.39 for his cooperation. In addition, the FBI sponsored a "Deferred Action" visa for CHS-1, in 2019, for his/her cooperation. CHS-1 affiliates with the Norteño street gang and has a criminal history that includes an April 2015 felony conviction for evading a peace officer, in violation of California Vehicle Code Section 2800.2(A) and a December 2016 felony conviction for false imprisonment, in violation of California Penal Code Section 236. After serving time for this conviction, CHS-1 was deported to Mexico. CHS-1's reporting has been considered reliable since he/she began working for the FBI and no instances of dishonesty have been identified with regard to CHS-1.

[2] In CHS-1' text conversations leading up to the controlled buy on May 18, 2020, CHS-1 and **Cabanillas** described the pills that contained fentanyl as "blues."

approximately 2:13 p.m., **Cabanillas** sent a text message to CHS-1 indicating that he had the pills and would be available to meet with CHS-1 at 3:30 p.m.

17. At approximately 2:51 p.m. CHS-1 "Facetimed" **Cabanillas**. At approximately 3:16 p.m. and then again at 3:22 p.m., **Cabanillas** called CHS-1 and told him/her that he was picking up the pills in "Broderick" (West Sacramento, California). At approximately 3:44 p.m., **Cabanillas** told CHS-1 he was on his way and that he had a "boat" (1000 pills), which he would need to separate for the CHS-1 when he arrived.

18. CHS-1 was provided with audio/video recording devices, a transmitter and $4600.00 in recorded FBI buy funds. At approximately 3:53 p.m., CHS-1 walked to the "buy location," near the Lowes Home Improvement Store in Citrus Heights, California, while under FBI/DEA surveillance. At approximately 3:56 p.m., CHS-1 arrived at the buy location and waited for **Cabanillas.**

19. **Cabanillas** arrived as the passenger in a grey Toyota Camry bearing California license plate number 8PEZ316. A search of the California Department of Motor Vehicles (DMV) database identified "EAN Holdings" (Enterprise Rentals) as the Camry's registered owner. In addition to **Cabanillas**, **Tabarez** and Jeffery Powell, along with two unidentified females (UF) were passengers in the Camry.

20. **Tabarez** and **Cabanillas** got out of the Camry and discussed the transaction with CHS-1. CHS-1 insisted that Powell stay away from him/her, due to a prior personal conflict. **Cabanillas** asked CHS-1 to see the money. **Tabarez** introduced himself to CHS-1 as "Greg" and explained that he was from "Broderick" (West Sacramento) and "Active" (a functioning Norteño gang member). **Tabarez** explained that he initially believed CHS-1 was going to purchase the pills at his house in Broderick. Later, **Tabarez** learned that they had to deliver the pills to CHS-1. At one point, **Cabanillas** returned to the Camry while CHS-1 and **Tabarez** continued to talk. **Tabarez** told CHS-1 that he/she could deal directly with him and that he would sell CHS-1 a whole "K-pak" (1000 pills) for "8" ($8000.00).

21. At approximately 4:34 p.m., a gold-colored Chevrolet pickup truck arrived at the buy location. The driver could not be identified; however, the passenger, subsequently identified by CHS-1 as **Cuaron**, introduced himself to CHS-1 as "Buba" and then gave him/her a bag containing 1000 "M30" pills. CHS-1 noted that **Cuaron** had a distinctive "Glock" brand firearm logo tattooed below his right eye. In exchange, CHS-1 gave **Cuaron** $4600.00 in recorded FBI buy funds. Based on a review of the audio/video recording, it appeared that **Cabanillas** and **Tabarez** also gave **Cuaron** an additional $4000.00 for their half of the 1000 "M30" pills. **Cuaron** told **Cabanillas, Tabarez** and

CHS-1 that he had just gotten out of prison but was going back because he was fighting two more cases. **Cuaron** separated from the group and departed the buy location in the gold Chevrolet pickup.

22. **Cabanillas**, **Tabarez** and CHS-1 got into the grey Camry and counted out 500 pills from the 1000 pills delivered by **Cuaron**. After counting the pills, **Tabarez** and **Cabanillas** argued about which bag to give CHS-1 and which bag could more easily be "hooped" (inserted into their rectum for concealment). Ultimately, **Cabanillas** gave CHS-1 a clear plastic Ziploc bag imprinted with a "Supreme" brand name logo.

23. At approximately 4:41 p.m. CHS-1 departed the buy location and walked back to the staging area while under surveillance. At approximately 4:45 p.m., CHS-1 arrived at the staging area where the pills and audio/video recording equipment were recovered. At approximately 4:48 p.m., CHS-1's person was searched for weapons and/or contraband with negative results.

24. Contemporaneously, the FBI/DEA surveillance team followed **Cabanillas** and **Tabarez** as they departed westbound on Greenback Lane in Citrus Heights. California Highway Patrol (CHP) Canine Officers trailed in marked CHP patrol vehicles. Based on the drug transaction observed by the FBI, CHP initiated an enforcement stop of the grey Camry (8PEZ316). As one of the Officers approached the passenger side of the Camry, **Cabanillas** was observed attempting to conceal something in his pants. A search of **Cabanillas** resulted in the seizure of approximately 500 additional blue-colored "M30" pills and a white powdery substance folded into a $20.00 bill. A parole search of **Tabarez** resulted in the seizure of approximately $601.00 in U.S. currency. In addition, three mobile phones, further described above and below as telephones **A-4, A-5, A-6** and **A-7**, were seized inside the Camry occupied by **Cabanillas** and **Tabarez.**

25. The CHP arrested **Tabarez** and charged him with felony California Health and Safety Code violations and a violation of the conditions of his parole. **Cabanillas** was also arrested and charged with California Health and Safety Code violations and booked on his active federal felony arrest warrant out of the EDCA.

26. At the staging area, Handling Agents debriefed CHS-1 regarding his/her observations during the buy/walk operation. CHS-1 assessed that **Cabanillas** organized the purchase of 1000 "M30" pills through **Tabarez** and **Tabarez** ordered the pills from his source of supply, **Cuaron**. CHS-1 reviewed an image of **Cabanillas** from the FBI's operational plan and confirmed he was person that arranged the transaction, counted the pills and handed him the bag containing 500 pills. CHS-1 reviewed an arrest and parole photograph of **Tabarez**, confirming he was the person that requested the delivery of the

pills to the buy location, offered to do future business with CHS-1 and assisted **Cabanillas** count the pills. CHS-1 also reviewed a parole photograph of **Cuaron** and confirmed he was the person with which he exchanged $4600.00 for 1000 "M30" pills.

27. After CHS-1 was dropped off, the FBI and members of the California Department of Corrections and Rehabilitation's (CDCR's) South Sacramento Parole Unit (Parole) reviewed **Cuaron's** GPS ankle monitor history. The GPS history confirmed that **Cuaron** was "pinging" at the buy location at the same time CHS-1 exchanged $4600.00 with **Cuaron** for 1000 "M30" pills. At approximately 7:00 p.m., Parole reviewed **Cuaron's** GPS history again, which indicated he was in Rancho Cordova, California.

28. The FBI and Parole deployed to Rancho Cordova and at approximately 7:35 p.m. arrested **Cuaron** inside Sunny's Market in Rancho Cordova. **Cuaron** was with East Side Piru gang member and parolee, Anthony Woods, and suspected Fruitridge Vista Norteño gang member, Anthony Sanchez. A search of **Cuaron's** person resulted in the seizure of three phones, further described above and below as telephones **A-1, A-2 and A-3,** and approximately $1952.90 in U.S. currency. Five of the $100 bills in **Cuaron's** pocket matched five of the FBI's recorded $100 bills used by CHS-1 to pay **Cuaron** during the buy/walk transaction. Parole arrested **Cuaron** for associating with gang members, a violation of the conditions of his parole.

29. A subsequent analysis of **Cuaron's** public Instagram social media account, "bubgtheemu42," revealed a "story" posted around the time of the buy/walk operation on July 13, 2020. In the story, a person can be seen fanning through dozens of $100 bills. One of the bills, bearing serial number, LE0747649E, matched one of the recorded $100 bills that CHS-1 gave **Cuaron** in exchange for 1000 "M30" pills during the buy/walk operation. Instagram account "bubgtheemu42" contains numerous images of **Cuaron** and carries an account name that incorporates part of Cuaron's known street moniker, "buba."

30. On the evening of July 13, 2020, all 1000 "M30" pills were booked into the FBI's Evidence Control Room. Given the shape, color, markings and price (approximately $9.20 per pill) your Affiant assesses that the 1000 "M30" pills seized on July 13, 2020, are counterfeit. Authentic "M30s," containing the opiate "Oxycodone," typically sell for about $30.00 per pill on the streets. Sacramento and surrounding communities are currently being flooded with counterfeit "M30s," suspected of being produced by the Mexican drug cartels, specifically the Sinaloa Cartel, for approximately $.35 per pill.

31. Given the danger to Officers and Agents posed by exposure to Fentanyl and the lack of reliable field test kits, the pills were not field tested. On July 15, 2020, the pills were

"Overnighted" to the DEA's Western Regional Laboratory (WRL) in Pleasanton, California.  A rush request is pending with the WRL.  Given the nature and circumstances of the transaction, statements made by **Cabanillas**, **Cuaron** and **Tabarez**, the price paid for the pills, the DEA lab results from the two previous controlled purchases from **Cabanillas**, I believe there is probable cause that the pills contained Fentanyl. I believe this because on May 13, 2020, CHS-1 exchanged text messages with **Cabanillas** to arrange the purchase of 100 "M30" pills by asking for "blues." Specifically, CHS-1 asked **Cabanillas**, "How much for 100 blues son." Based on my experience with this investigation and other investigations involving illicit pharmaceutical sales, I believe the term "blue" is used to describe counterfeit "M30" pills because of their blue color. The May 13, 2020, text messages led to CHS-1 facilitating the controlled buy/walk of 100 "M30" pills from **Cabanillas** on May 18, 2020, at the behest of the FBI. Subsequent DEA laboratory analysis confirmed that these 100 "M30" or "blues" contained Fentanyl. In addition, the "M30s" purchased by CHS-1 on May 8, 2020, May 18, 2020 and July 13, 2020, all carried the same "M" and "30" stamp.

## SEARCH OF DIGITAL INFORMATION

32. Your affiant is aware that drug traffickers, including  **Cabanillas**, **Tabarez** and **Cuaron,** use computers, smart phones, and other electronic media to conduct their trade. As described above and in Attachment B, your affiant submits that computers, smart phones, and possibly other storage media may contain evidence of **Cabanillas'**, **Tabarez'** and **Cuaron's** ongoing criminal conduct and there is probable cause to search those items for the reasons stated below. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

33. For example, based on my knowledge, training, and experience, your affiant is aware that a powered-on computer maintains volatile data. Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity. Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed. Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

34. Based on my knowledge, training, and experience, your affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files

downloaded to a storage medium can be stored for years at little to no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

35. Also, again based on your affiant's training and experience, wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

36. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

37. Thus, the forensic analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related

documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

38. In cases of this sort, laptop computers and/or smartphones are also used as instrumentalities of the crime to commit offenses involving interstate drug sales and movement of drug proceeds. Devices such as modems and routers can contain information about dates, frequency, and computer(s) used to access the Internet. The laptop or smart phone may also have fingerprints on them indicating the user of the computer and its components.

39. Similarly, files related to the purchasing and selling of controlled substances, as well as, the movement of currency found on computers and other digital communications devices are usually obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the data, search terms used, exchange, transfer, distribution, possession or origin of the files. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary internet directory or "cache". The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

40. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Your affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of internet connection at the residence.

41. Searching the phone(s) for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or internet use is located in various operating system log files that are not easily located or reviewed. In addition, a person engaged in criminal activity will attempt to conceal

evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this location (the computer) for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

42. Based upon knowledge, training and experience, your affiant knows that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

43. The nature of evidence: As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

44. The volume of evidence and time required for an examination: Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or

months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

45. Technical requirements:  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.   Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off- site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

46. Variety of forms of electronic media: Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

47. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

CONCLUSION

48. Based on the above information, I believe that there is probable cause to believe that **Gregory Tabarez**, **Joseph Elijah Cuaron** and **Joshua Adrian Cabanillas** conspired to distribute and to possess with intent to distribute Fentanyl, in violation of 21 U.S.C. §§ 846, 841(a)(1). I hereby request that this court issue an arrest warrant for **Tabarez** and **Cuaron**. Additionally, I believe there is probable cause to believe that the identified mobile phones to be searched may contain evidence of **Cabanillas,' Tabarez'** and **Cuaron's** criminal conduct. I hereby request that this court issue a search warrants for the following mobile phones:

> **MOBILE PHONES TO BE SEARCHED**
> - **A-1**: (Seized on **Cuaron's** person incident to arrest) Black iPhone XR Model MT2E2LL/A, Serial Number FK2XPM91KXKN (Described further in Attachment A-1)

12

- **A-2**: (Seized on **Cuaron's** person incident to arrest) LG Model LM-K500UM, IMEI: 352488116634826, Serial Number 006VTRG0338582 (Described further in Attachment A-2)
- **A-3**: (Seized on **Cuaron's** person incident to arrest) Coolpad Model Coolpad 3312A, FCC ID R38YL3312A, Build Number 3312A.SPRINT.191018.OD (Described further in Attachment A-3)
- **A-4**: (Seized in rental vehicle incident to arrests of **Tabarez** and **Cabanillas**) Black iPhone Model A1160, FCC ID BCG-E3085A, in dark tinted Tech21 Case (Described further in Attachment A-4)
- **A-5**: (Seized in rental vehicle incident to arrests of **Tabarez** and **Cabanillas**) Red iPhone, in clear Tech21 Case (Described further in Attachment A-5)
- **A-6**: (Seized in rental vehicle incident to arrests of **Tabarez** and **Cabanillas**) ZTE Smart Phone Model Z982, IMEI: 869977032137886, Serial Number 320284580429 (Described further in Attachment A-6)
- **A-7**: (Seized in rental vehicle incident to arrests of **Tabarez** and **Cabanillas**) Samsung Smart Phone Model SM-A205U, IMEI: 35274117885452 (Described further in Attachment A-7)

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

/s/ David Sieber

DAVID SIEBER
Special Agent, Federal Bureau of
Investigation

Subscribed and sworn to me
telephonically on:

July 16, 2020

The Honorable Allison Claire
UNITED STATES MAGISTRATE JUDGE

/s/

Approved as to form by AUSA

13

## ATTACHMENT A-1

The property to be searched is a **Black iPhone XR Model MT2E2LL/A, Serial Number FK2XPM91KXKN,** hereinafter "A-1."  The Device is currently in the possession of the Federal Bureau of Investigation.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-2**

The property to be searched is an **LG Model LM-K500UM, IMEI: 352488116634826, Serial Number 006VTRG0338582**, hereinafter "A-2."  The Device is currently in the possession of the Federal Bureau of Investigation.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT A-3

The property to be searched is a **Coolpad Model Coolpad 3312A, FCC ID R38YL3312A, Build Number 3312A.SPRINT.191018.OD,** hereinafter "A-3."  The Device is currently in the possession of the Federal Bureau of Investigation.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT A-4

The property to be searched is a **Black iPhone XR Model MT2E2LL/A, Serial Number FK2XPM91KXKN,** hereinafter "A-4." The Device is currently in the possession of the Federal Bureau of Investigation.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## <u>ATTACHMENT A-5</u>

The property to be searched is a **Red iPhone, in clear Tech21 Case**, hereinafter "A-5." The Device is currently in the possession of the Federal Bureau of Investigation.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT A-6

The property to be searched is a **ZTE Smart Phone Model Z982, IMEI: 869977032137886, Serial Number 320284580429**, hereinafter "A-6." The Device is currently in the possession of the Federal Bureau of Investigation.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT A-7

The property to be searched is a **Samsung Smart Phone Model SM-A205U, IMEI: 35274117885452**, hereinafter "A-7." The Device is currently in the possession of the Federal Bureau of Investigation.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records on the Device described in Attachment **A-1, A-2, A-3, A-4, A-5, A-6** and **A-7** that relate to violations of 21 U.S.C. §§ 841(a) and 846, Conspiracy to Distribute a Controlled Substance, and that involve **Joshua Adrian Cabanillas**, **Gregory Tabarez** and/or **Joseph Cuaron**. These records include:

1. Any and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the mobile telephone or on a server and associated with the mobile telephone, including:

    i. Incoming call history;

    ii. Outgoing call history;

    iii. Missed call history;

    iv. Outgoing text messages;

    v. Incoming text messages;

    vi. Draft text messages;

    vii. Telephone book;

    viii. Data screen or file identifying the telephone number associated with the mobile telephone searched;

    ix. Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;

    x. Voicemail;

    xi. User-entered messages (such as to-do lists); and

    xii. Stored media such as photographs or video.

2. Any passwords used to access the electronic data described above.

3. Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted.

4. Any and all locations, addresses, GPS coordinates, names, time/date information, or other electronic data related to addresses and driving directions.

5. Data and information related to stored applications and/or websites used to communicate with associates and co-conspirators.

6. Lists of customers and related identifying information.

7. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions.

8. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information).

9. All bank records, checks, credit card bills, account information, and other financial records.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.